**Adam GAYNOR, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 62A01–0903–CR–136.**

Court of Appeals of Indiana.

Oct. 7, 2009.

Transfer Denied Nov. 17, 2009.

---

John Pinnow, Greenwood, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Adam Gaynor was convicted of multiple drug offenses. He argues two of his convictions, manufacturing methamphetamine and maintaining a common nuisance, were not supported by sufficient evidence. We affirm his conviction of manufacturing methamphetamine, but we reverse his conviction of maintaining a common nuisance because the State did not prove he had any control over the premises.

## FACTS AND PROCEDURAL HISTORY

On August 14, 2007, Casey Evans–Austin was working as a delivery person for Papa John's in Tell City. Around 12:30 p.m., she delivered food to 5420 Sandstone Lane in Cannelton. She had made deliveries there before, and she knew it was Jimmy Story's house. Because it was a warm day, she had her truck windows down, and she smelled something strange as she pulled up. Two men were in the yard and appeared to be working on something. When she approached the house, Story opened the door. Evans–Austin was "immediately overpowered" by a "bitter ... chemical smell" that burned her throat and eyes and made her cough. (Tr. at 210.)

When Evans–Austin returned to Papa John's, she was still having difficulty breathing. Based on information she had read, she believed she had encountered a methamphetamine lab. She called the police to tell them about the suspected lab and to ask if she should obtain medical treatment.

Deputy Lee Chestnut of the Perry County Sheriff's Department took a statement from Evans–Austin and then obtained a search warrant for 5420 Sandstone Lane. In his experience with methamphetamine labs, Deputy Chestnut had found "usually more than one person [is] present, and it usually takes multiple people with all the ingredients to obtain pills or anhydrous [ammonia]. Normally, one person never just does it on their [sic] own." (Id. at 236.) To execute the warrant, Deputy Chestnut assembled a team, which included Chief of Police Gregory Hendershot and Detective Alan Malone of the Tell City Police Department and Sergeant Jon Deer, Trooper Mark Lehmkuhler, and Trooper Brett Hoover of the Indiana State Police. Troopers Lehmkuhler and Hoover arrived first and went to the back of the residence. Deputy Chestnut and Sergeant Deer arrived second and went to the door. Chief Hendershot and Detective Malone arrived last. Chief Hendershot went to the side of the residence and Detective Malone went to the front.

Deputy Chestnut knocked on the door and announced that he was from the Sheriff's Department and had a warrant. Deputy Chestnut heard one of the officers in

the back yelling, so he opened the door. He saw Story standing between the kitchen and the living room. The chemical odor was so strong that the officers quickly became short of breath and had to withdraw from the house before they could finish a protective sweep. Deputy Chestnut brought Story out with him.

As they were exiting, Chief Hendershot alerted them that someone was coming through a window. The person was identified as Candy James, Story's cousin. James was trying to get out through the window in the master bathroom because she was having extreme difficulty breathing. She told police she may have knocked over some chemicals as she struggled to get out.

After Trooper Lehmkuhler threatened to send in his dog, four more people exited the house: Adam Gaynor, Shawn Kahler, Eric Doogs, and Randy Leinenbach. Gaynor is a cousin of Story and James. All six were arrested, and a clandestine lab team completed the search of the residence.

The evidence recovered from the property included:

- Numerous tablets, including 69 pills with a net weight of 7.73 grams that contained ephedrine or pseudoephedrine.
- Two tanks containing anhydrous ammonia.
- An additional cylinder tank that smelled of anhydrous ammonia and had a modified valve.
- Two pitchers containing a "white and pink chunk material and a cloudy liquid," which was bubbling. (*Id.* at 519.) According to Doug Humphrey of the Indiana State Police Methamphetamine Suppression Unit, these pitchers corresponded to the first stage of the manufacturing process, in which pills, lithium, and ammonia are combined. A sample of the material tested positive for methamphetamine.
- Three HCL generators, at least one of which was still smoking. An HCL generator is a bottle (in this case, pop bottles) in which sulfuric acid is combined with salt to produce hydrogen chloride gas. The gas comes out a tube and is used in the final stage of the manufacturing process to crystallize the methamphetamine. An acidic residue remains behind in the bottles. The residue had not been sitting long enough to eat through the bottles.
- A lockbox containing digital scales, a plastic container of methamphetamine weighing 11.27 grams, and money.
- .5 grams of methamphetamine were found in a cigarette pack, .21 grams of methamphetamine were found in a coffee filter, and .91 grams of methamphetamine were found in an eyeglass container.
- Marijuana with a gross weight of 12.8 grams.
- A glass smoking device.
- A hand gun, two shotguns, and a rifle.

James made a statement to the police on the day she was arrested. She eventually accepted a plea bargain that required her to testify in Gaynor's case. She testified 5420 Sandstone Lane was Story's residence. James had arrived there sometime on August 9th and Gaynor arrived sometime on the 11th. On the evening of the 13th, an unknown woman brought some pills to Story's residence, and Story crushed them in a blender. James, Story, and the woman all smoked methamphetamine together. James believed Gaynor also smoked methamphetamine sometime that weekend.

On the 14th, James first woke up around 2:00 p.m. She, Story, and Gaynor were the only people there. Leinenbach and Doogs

arrived around 2:30. James saw them get a tank of anhydrous ammonia out of a car. They took the tank inside and hooked it to another tank to transfer the anhydrous ammonia from one tank to the other. James testified someone suggested putting something cold on the tanks to make the transfer go faster.[1] Everyone—including Gaynor—participated in taking frozen items from the freezer and putting them on the tanks. While this transfer was in progress, the police arrived. Everyone inside panicked, and something caused the chemical odor to intensify.

Gaynor was charged with Count 1, Class A felony dealing in methamphetamine in an amount of three grams or more;[2] Count 2, Class C felony possession of methamphetamine;[3] Count 3, Class C felony illegal possession of anhydrous ammonia;[4] Count 4, Class C felony possession of chemical reagents or precursors with intent to manufacture controlled substances;[5] Count 5, Class D felony maintaining a common nuisance;[6] Count 6, Class A misdemeanor possession of marijuana;[7] Count 7, Class A misdemeanor possession of paraphernalia;[8] and Count 8, Class C felony possession of more than ten grams of ephedrine, pseudoephedrine, or phenylpropanolamine.[9] Story pled guilty to manufacturing methamphetamine. He was the sole witness for Gaynor and testified Gaynor was not involved in any way with the manufacturing. The jury found Gaynor guilty of Counts 1, 2, 5, 6, and 7. On appeal, Gaynor challenges only his convictions of manufacturing methamphetamine and maintaining a common nuisance.

## DISCUSSION AND DECISION

In reviewing the sufficiency of evidence, we do not reweigh the evidence or assess the credibility of witnesses. *Bruno v. State,* 774 N.E.2d 880, 882 (Ind.2002), *reh'g denied.* We consider the evidence favorable to the verdict and the reasonable inferences to be drawn therefrom. *Id.* We will affirm if there is probative evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

### 1. *Manufacturing Methamphetamine*

 Gaynor acknowledges James testified he participated in placing frozen items on the tanks to facilitate the transfer of anhydrous ammonia. However, he claims the jury must not have believed this testimony because it acquitted him of Count 3, illegal possession of anhydrous ammonia. We disagree. Count 3 was enhanced to a Class C felony based on the alleged possession of a firearm, and the jury was not given the option to convict Gaynor of the lesser offense. The jury could have found that he was involved in cooling the tanks,

---

1. Humphrey testified cooling the tanks reduces the volatility of anhydrous ammonia.

2. Ind.Code § 35–48–4–1.1(a)(1) and (b)(1).

3. Ind.Code § 35–48–4–6.1(a) and (b)(1). This offense was alleged to be a Class C felony because the amount of the drug was three grams or more and/or Gaynor possessed a firearm.

4. Ind.Code § 35–48–4–14.5(a)(5) and (c)(1).

5. Ind.Code § 35–48–4–14.5(e) and (f)(1). Specifically, the information alleged Gaynor possessed organic solvents, hydrochloric acid, lithium, ether, and/or sulfuric acid. *See* Ind. Code § 35–48–4–14.5(a)(6), (7), (8), (10), and (11).

6. Ind.Code § 35–48–4–13(b)(2).

7. Ind.Code § 35–48–4–11(1).

8. Ind.Code § 35–48–4–8.3(a)(1).

9. Ind.Code § 35–48–4–14.5(b)(1).

but did not possess firearms.[10] That would explain an acquittal on Count 3 and a conviction on Count 1.

Gaynor argues that even if there is sufficient evidence he manufactured methamphetamine, there is insufficient evidence that the amount was three grams or more. He acknowledges an amount well over three grams was discovered, but argues it may have been made before he arrived at Story's residence. However, the State presented circumstantial evidence that methamphetamine recently had been manufactured. Three HCL generators, which are used in the last stage of the process, were found on the back porch. At least one was still smoking. Humphrey testified this meant it had been used within the past two days, which was during the time Gaynor was at Story's residence. Story testified the bottles will "smoke for probably over night" and had been outside "probably a day or so." (Tr. at 571.) The acidic residue had not eaten through any of the bottles. The occupants of Story's residence had recently received deliveries of ephedrine pills and anhydrous ammonia, and there was a mixture bubbling in the bathroom at the time of their arrest. Thus, the jury could infer the manufacturing was ongoing while Gaynor was at Story's residence.

### 2. *Maintaining a Common Nuisance*

█ The State was required to prove Gaynor knowingly or intentionally maintained 5420 Sandstone Lane, a place used one or more times to unlawfully manufacture, keep, offer for sale, sell, deliver, or finance the delivery of controlled substances or items of drug paraphernalia. Ind.Code § 35–48–4–13. Gaynor argues the State did not prove he "maintained"

5420 Sandstone Lane. "Maintenance" does not mean legal ownership. *Jones v. State,* 807 N.E.2d 58, 66 (Ind.Ct.App.2004), *trans. denied.* The defendant must exert control over the premises. *Id.* at 67.

The State argues it presented sufficient evidence under *Ross v. State,* 908 N.E.2d 626 (Ind.Ct.App.2009). Ross was dealing drugs out of rooms at the New Castle Inn, and on some occasions, he did not have exclusive control of the rooms. He argued there was insufficient evidence he maintained a common nuisance, but a panel of this court affirmed:

> Pursuant to Indiana Code section 35–48–4–13, the State was required to prove that Ross knowingly or intentionally maintained a place that was used one or more times for selling a controlled substance. In order to maintain a place, one must have control over it. *See Jones v. State,* 807 N.E.2d 58, 66 (Ind. Ct.App.2004), *trans. denied.*
>
> In cases where the accused has exclusive possession of the premises on which the contraband is found, an inference is permitted that he or she knew of the presence of contraband and was capable of controlling it. However, when possession of the premises is non-exclusive, the inference is not permitted absent some additional circumstances indicating knowledge of the presence of the contraband and the ability to control it. Among the recognized "additional circumstances" are: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband is in plain

---

**10.** The jury also acquitted Gaynor of Counts 4 and 8, the two other counts that required the jury to find Gaynor possessed a firearm.

view; and (6) location of the contraband is in close proximity to items owned by the defendant.

*Holmes v. State,* 785 N.E.2d 658, 660–61 (Ind.Ct.App.2003) (citations omitted). "These circumstances apply to show constructive possession even where the defendant is only a visitor to the premises where the contraband is found." *Collins v. State,* 822 N.E.2d 214, 222 (Ind.Ct. App.2005) (citing *Ledcke v. State,* 260 Ind. 382, 296 N.E.2d 412, 416 (1973)), *trans. denied.*

\* \* \* \* \* \*

We find that the jury could reasonably infer that Ross had knowledge and control over the cocaine where the evidence shows that, on two occasions, the CI did not have any controlled substance on his person before meeting with Ross; the CI was under surveillance; the CI did not interact with anyone other than Ross; and the CI subsequently returned with cocaine after meeting with Ross. Accordingly, the evidence of additional circumstances is sufficient to prove that Ross maintained a place where he sold cocaine more than one time.

*Id.* at 631.

*Ross* side-stepped the issue of whether the defendant had control of the premises by deciding he had control of the cocaine. *Ross* relied on *Holmes,* a case concerning possession of drugs, not maintaining a common nuisance. Other than incriminating statements, it is not apparent how the other *Holmes* factors are relevant to control of premises. We respectfully disagree with *Ross's* conclusion that the State need prove only control of the contraband and not control of the premises. The State cites no evidence Gaynor had any control over the premises, but relies solely on *Holmes* factors other than incriminating statements. We therefore conclude there was insufficient evidence Gaynor maintained a common nuisance.

## CONCLUSION

Gaynor's conviction of maintaining a common nuisance is reversed. The judgment of the trial court is affirmed in all other respects.

Reversed in part and affirmed in part.

CRONE, J., and BROWN, J., concur.